[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Union Trust Company (Union Trust) has brought the CT Page 94 above-captioned action to foreclose its mortgage on real estate in Southington and other security instruments given to secure the payment of a note given it by 714 Main Associates, a Connecticut partnership in which Robert D. Hartman and Steven B. Witten[1] were the partners. This note was in the principal sum of $1,600,000.00. A number of other defendants were also joined all of whom have previously been defaulted except the defendant Walter S. Wood who did not appear and defend at the trial of this case. Unless otherwise stated, the term "defendants" as used in this memorandum will be understood to refer to 714 Main Associates 714 Main Associates and Robert Hartman (Hartman).
It should be pointed out that in addition to this action in which the note involved was given as security for property at 704, 706, 708, 714 Main Street in Southington, Union Trust also brought another action, i.e. CV-90-0313135-S which was consolidated with the instant case which other action will be referred to us the "Trumbull foreclosure". That latter action involves the foreclosure of a mortgage given by the defendant Hartman and his wife Carol Hartman on their residence in Trumbull.
At the trial, Union Trust, 714 Main, Robert Hartman and Carol Hartman filed a written stipulation that provided inter alia that "all evidence to be heard with regard to the 714 Main Foreclosure is equally applicable to the Hartman [Trumbull] foreclosure." That stipulation also provided what was to occur as to the Trumbull foreclosure case depending upon the outcome of the 714 Main foreclosure.[2]
As to the 714 Main foreclosure the defendants, as their post-trial brief states, have admittedly "not contested the basic elements of that case: the loan at issue was made, the defendant received the funds, it has not been paid according to its tenor and interest has accumulated as shown." The defendants say that they "simply take issue with the relief[3] the plaintiff seeks in light of its claims and that issue is reflected in the defendants' special defenses and counterclaim" which will be discussed in detail below. Among the exhibits introduced by Union Trust was the guaranty agreement of Robert Hartman as to the May 23, 1989 note as well a mortgage deed, dated May 23, 1989 of Robert Hartman and Carol Hartman giving Union Trust a mortgage interest in the Hartman's Trumbull residence to secure the guaranty. CT Page 95
We, initially, look at the complaint in the 714 Main foreclosure. In addition to the admissions by the defendants, as to the complaint in the pleadings the court specifically finds from the evidence of Paul Savino, a vice-president of Union Trust, that as of September 16, 1992, the principal balance due and owing on the demand time note in the original amount of one million six hundred thousand dollars ($1,600,000) given by 714 Main is $1,600,000. This acquisition loan of $1,600,000. by the plaintiff was closed with the defendants on May 23, 1989. Interest has accrued on that amount through September 16, 1992 is $419,533. and will continue to accrue at the rate of $422.23 per day.
Union Trust also adduced the evidence by Jarvis Nichols, its real estate expert, on the matter of the value of the 714 Main property in Southington. It was Nichols' opinion that the value of the 714 Main property is $860,000. and this court so finds. The defendants did not produce any real estate expert.
While it might appear that, without more, Union Trust is entitled to judgment on its complaint, judgment on the complaint certainly cannot be entered given the posture of the defendants as set out in its special defenses. It is, therefore, necessary that we now go into the special defenses of the defendants.
Essentially, the defendants' special defenses articulate defenses of estoppel, breach of the implied covenant to deal in good faith and violations of the Connecticut Unfair Trade Practice Act (CUTPA) General Statutes 42-110a et seq. The defendants argue inter alia that even if the CUTPA defenses are rejected, but that either the "estoppel" or "bad faith" defenses are accepted, then it is possible that one of the possible scenarios is a complete denial of relief to Union Trust. It is apparently also maintained that if a CUTPA special defense is proven then one potential scenario is also the complete denial of relief to Union Trust as that also assumes a ruling in favor of the defendants on the counterclaim. Parenthetically, we note at this point that the counterclaim interposed by the defendants incorporates as affirmative allegations, essentially the substance of its special defenses. Union Trust denies all the special defenses as well as all the essential allegations of the counterclaim.
The witnesses who testified in this case and upon whose credibility the court had to pass were the following: Paul CT Page 96 Savino who was a vice-president of the plaintiff; Jarvis Nichols who was the plaintiff's real estate appraiser; Robert Hartman and Steven Witten who were the principals in 715 Main Street Associates; David McClellon who a vice president and commercial loan officer of the plaintiff and Peter Keller who was senior vice-president of the plaintiff and in charge of retail lending for the plaintiff. During the presentation of the evidence serious questions of credibility were presented.
The trier of fact determines the credibility of witnesses and the weight to be accorded their testimony and where the evidence is conflicting, its probative force is for the trier of fact to determine. Robert Lawrence Associates Inc. v. Del Vecchio, 178 Conn. 1, 14 (1979); McNamee v. Woodbury Congregation of Jehovah's Witnesses, 194 Conn. 645, 648 (1984). It may also draw reasonable inferences from the evidence. In re Juvenile Appeal (82-AB), 188 Conn. 557, 561 (1982). The trier may believe all or part of the testimony of a witness. Gutlzowski v. New Britain, 165 Conn. 50, 56 (1979). The court "is not bound by the uncontradicted testimony of any witness . . . [and] in evaluating such testimony, the trial court must assess the credibility of the testifying witness and consider the presence or absence of corroborating evidence." Bieluch v. Bieluch, 199 Conn. 555-556 (1986). Testimony that goes uncontradicted does not thereby become admitted and undisputed; . . . nor does the strength of a witness' belief raise it to that level." Stanton v. Grigley,177 Conn. 558, 562 (1979). The interest of any witness, including a party, may be considered on the issues of credibility. Banks v. Watrous, 136 Conn. 513, 515 (1945); State v. Silveira, 198 Conn. 454,474 (1986). "It is the peculiar province of the trial court to observe the demeanor of the parties and their witnesses and to draw inferences therefrom as to the motives underlying their testimony and conduct." Dadio v. Dadio, 123 Conn. 88, 93 (1937). Expert testimony is to be considered, weighed and tested like any other testimony. State v. Kelly, 77 Conn. 266, 275 (1904), Tait and LaPlante, Connecticut Evidence (1988) 7.16.61.
The defendants Hartman and 714 Main have set out in their post-trial brief, a lengthy series of "facts" which they submit that they have established on the evidence in support of their special defenses. Based on that evidence they claim that the following factual conclusions can be reached: 1. In addition to the loan actually closed to the [$1,600,000. loan made by the plaintiff which closed on May 23, 1989] the plaintiff "promised to provide the defendants with an additional one million dollars CT Page 97 [by way of a credit line]." 2. The plaintiff "also promised to release the mortgage on Hartman's house [in Trumbull] upon receipt of the approvals from the Town of Southington [concerning the defendants 714 Main Street project in that Town]." Their briefing also sets out the evidence they claim supports these factual conclusions. The parties have incorporated their pre-trial briefs into those briefs each filed post-trial.
In addition, they maintain that the legal conclusions that can be arrived at under the law set out in their briefing are as follows:
"1. The Bank enticed the defendants into believing that it would fund the project, either during an interim period, or fully, and the defendants stopped seeking financing elsewhere. As a result of the denial of funding, particularly with regard to the reneging of the Bank on the million dollar credit line, the defendants were not able to complete the project, losing their investment and the opportunity to achieve the projected profits. This satisfies the requirements of equitable estoppel.
2. The Bank did not act in good faith in that it did not keep its promises to provide the million dollar credit line. This failure was particularly irksome as the Bank knew the defendants were relying on this funding to bridge the gap into construction financing and that the defendants did not pursue it after the Bank raised its interest in doing the full financing. This refusal to keep the promise to provide the million dollar funding was the real death-blow to the project, and the Bank's refusal to provide it was an act of bad faith. Cf., Bank of Boston Connecticut v. Capitol West Associates Limited Partnership, 7 Conn. Sup. Ct. Rpts. 1069 (1992) (copy attached).
3. The recognition of the Bank's promise to provide the credit line is not barred by the Statute of Frauds. The Statute only bars actions seeking to recover for claims that might fall within the statute, it does not bar claims that might be raised as defenses. In particular, it does not bar defensive claims based on equitable estoppel. See S.H.V.C., Inc. v. Roy,37 Conn. Sup. 579 (1981), aff'd 188 Conn. 503 (1982).
To the extent the defendants' CUTPA claims may appear to rely on an oral agreement to lend more than $50,000. that, too, falls outside the statute, as the gravamen of the CUTPA claim is not that there was a breach of contract, but rather, that there CT Page 98 was a course of conduct that included the oral promise that violated the statutes.
4. For the reasons discussed in the Defendant's Pretrial memo, the plaintiff's actions discussed above are a violation of CUTPA."
At this juncture the court will set down certain additional facts it has found on the evidence which will be supplemented by other findings hereinafter as required to resolve the issues. Robert Hartman, by his own admission as he testified, was "an experienced developer." This strip shopping center at 714 Main Street in Southington upon which the plaintiff placed its $1,600,000 mortgage on May 23, 1989 was not the first strip shopping center he developed. While he could not remember how many strip shopping centers he had developed before he did remember one or two in Connecticut and New Jersey.
The 714 Main property first attracted Hartman's interest in the fall of 1987. He started to talk to Steven Witten whom he knew socially, about this site in the summer of 1988. Hartman believed that it could be developed into a strip shopping center and so told Witten. Discussions concerning its possible purchase took place, inter alia, with Walter Wood, who owned the property which encompassed 3.371 acres, more or less which then improved with a one-story steel framed building containing approximately 25,000 square feet. Walter Wood (a defendant in this case) was the owner of this property. In the winter of 1988 or January 1989 a decision was made to endeavor to buy the site together with the improvements on it. In January 1989 Hartman spoke about its proposed purchase to Peter Keller, who at that time was a senior vice president of the plaintiff and in charge of retail lending for the bank. Keller and Hartman knew each other because Hartman had other loans with the plaintiff and Keller was considered Hartman's account officer.
On January 13, 1989, Hartman wrote Keller concerning "the contract being negotiated" with reference to the 714 Main property[4] title to which, it was anticipated, would be transferred to 714 Main Street Associates.[5] In that letter Hartman also said "As we discussed, we would be looking for $2.5 million to cover soft costs and construction costs to build 40,000 + sq. ft. on the site. The loan would be for approximately 18 months and you [the plaintiff Bank] would have a first mortgage on the property as we discussed over lunch." This CT Page 99 letter contains no reference to any one million dollar line of credit. Keller received this letter.
On February 14, 1989, Hartman again wrote Keller, stating that the purpose of this letter[6] was ". . . to briefly outline the salient points affecting our planned acquisition, rehabilitation and expansion of the above referenced property. [714 Main Street]. Prior to April 6, 1989, Keller had discussions with Hartman regarding the plaintiff providing some funds in addition to acquisition financing for 714 Main as the plaintiff bank had agreed to lend Hartman or 714 Main Street Associates sufficient funds to acquire that property and some additional $200,000. to get the project started.
Thereafter, by a long letter dated April 6, 1989 to 714 Main Associates over Peter Keller's signature as senior vice president of the plaintiff, the plaintiff bank stated that "Union Trust Company is pleased to advise you that your request for a $1,600,000.00 demand loan to 714 Main Associates has been approved under the following terms and conditions . . . ." That "commitment letter" then set out the terms and conditions made fourteen separate headings.[7] One is entitled "Personal Guarantees and Security" provided "Personally guaranteed by Robert D. Hartman — Steven B. Witten. These guarantees will be secured by a second mortgage on the guarantors primary residence. All titled owners will sign the mortgage deeds."[8] The "security" for this loan was described to be "A first mortgage on land and buildings at 704-706, 708-714 Main Street, Southington, CT." It also provided that ". . . this commitment shall not be effective unless it is accepted in writing by the principals within ten (10) days from the date hereof . . . ." The only term or condition not acceptable to Hartman was that captioned "zoning approval" and he crossed that out before the April 6, 1989 letter was returned. As requested in the letter, both Robert Hartman and Steven Witten signed and returned an attached copy of this letter to the plaintiff on April 10, 1983 indicating them acceptance of the commitment. In doing so each of them signed this commitment letter not only as "partner" but also "personally". Although Hartman requested this formal commitment from the plaintiff, it is a normal practice of the plaintiff to issue a formal commitment letter for a loan of this amount, i.e. $1,600,000.
After the issuance of the April 6, 1989 commitment letter Keller was not involved in the documentation of this $1,600,000 CT Page 100 loan but one [Alphonse] DelBasso who worked in the plaintiff's Southington office was the loan officer who closed the loan. The 714 Main site was almost immediately across the street from the plaintiff's Southington office and it was the normal practice of the plaintiff at that time that a particular loan in the retail division would go to the plaintiff's branch near the project. Prior to the closing of the plaintiff's first mortgage on 714 Main on May 23, 1989, Witten had no discussion with anyone at the plaintiff bank about the loan, only Hartman did.
714 Main Associates is a Connecticut partnership. See General Statutes 34-40 et seq. Robert Hartman and Steven Witten were, on May 23, 1989, the general partners of that partnership and both signed the $1,600,000 mortgage note and deed as partners. Witten has since gone bankrupt. Robert Hartman is a general partner and, as such, is jointly and severally liable for the debts of the partnership. See General Statutes 34-53 under which all partners have been held to be jointly and severally liable for partnership debts. Fuessenich v. DiNardo,195 Conn. 144, 159 (1985).
Among the documents of the mortgage closing of May 23, 1989, was an "Agreement re: Drawdown of Loan Proceeds" executed for 714 Main associates by Hartman and Witten as partners and for the plaintiff bank by Alphonse DelBasso, its assistant vice president. This agreement acknowledged the execution on that date of the $1,600,000. mortgage deed and note and various other documents. It further recited that because the plaintiff bank had relied on the borrower representation to it that a portion of the proceeds of the note would be used to construct additional improvements on the premises and that the borrower's had that date applied $1,315,333.67 toward the purchase of the premises that the borrower had agreed with the plaintiff bank and did that day deposit the balance of the loan proceeds, i.e. $284,666.33 into a Premium market Account. It was further agreed that the borrower would not withdraw any of those funds from that account until the borrower had secured final zoning approval from the Town of Southington to build an additional 10,500 square feet of retail building space. Some time later the zoning approval was received and 714 Main Associates then had the use of this money.
After the mortgage loan was closed Witten was in touch with DelBasso concerning the release of the mortgage monies involving zoning issues. Witten also discussed the project in some detail with DelBasso. He got involved with efforts to obtain CT Page 101 construction financing for this project after the May 23, 1989 although he could not recall specifically recall when those efforts began. Witten spoke to DelBasso concerning the project on several occasions. Some time later DelBasso indicated to Witten that the plaintiff might be interested in doing the construction financing for the 714 Main project. Witten conveyed this information to Hartman. On September 15, 1989, Hartman, after his telephone conversation with DelBasso, wrote DelBasso enclosing a copy of the approval letter of the Riverview Plaza site by the Southington Planning and Zoning Commission. The only time Hartman ever spoke to DelBasso was on September 15, 1989.
Witten later gave DelBasso another and different pro forma for the project than the one Hartman had given Keller earlier. The latest pro forma, which was more comprehensive than the one he sent Keller in February 1989, encompassed a different scope of work from the earlier one. It showed, inter alia, that anticipated construction costs had increased by $800,000 and that the entire cost of the project was stated to be $4,491,022 of which $3,750,000 was sought as construction financing. This latest pro forma was made available to David McClennon, who was a vice president and commercial loan officer of the plaintiff working out of Hartford. This came about after McClennon had received a telephone call in Hartford from DelBasso indicating that DelBasso had a prospective borrower that was interested in obtaining a permanent construction mortgage from the plaintiff on a Southington facility. A meeting was arranged and took place over lunch in a Southington restaurant between Witten, DelBasso and McClennon on October 16, 1989 concerning 714 Main. Prior to that meeting McClennon had reviewed the package of information submitted by Witten on the latest pro forma. At that October 16th meeting McClennon indicated to Witten that he would be willing to recommend construction financing for the 714 Main project in the amount of $3,160,000. He also informed Witten that there were certain items missing from the information which needed to be supplied to entertain the request for construction financing. Witten indicated that he would obtain the missing information. Witten did not indicate that the figure of $3,160,000 was not a satisfactory dollar figure although he did ask if there was any way to increase that figure. McClennon in turn indicated that if it could be shown that the 714 Main property was able to generate sufficient income to support a higher debt, then the plaintiff bank would consider entertaining a request for a larger amount in a type of step up process. By a letter dated October 24, 1989, Hartman wrote DelBasso indicating CT Page 102 that Witten had informed him that the October 16th meeting had indicated several items were missing from 714 Main's information package and that Hartman was enclosing what he believed needed to remedy that. Keller was not involved in 714 Main's request for financing construction as that was in the plaintiff's commercial department which was not his department. He was, however, aware that such a request had been made from either Hartman or DelBasso. Keller had no input into the application process for 714 Main's Construction financing.
The plaintiff's approval process for the loan request involved a required three tiered approval process. The first tier involved the presentation of the request to the regional or mortgage loan committee. Assuming approval at the first tier, the second tier would have been a presentation to the senior loan committee. Assuming approval at the second tier (senior loan committee), the final tier would be presentation to the executive committee. Once the executive committee approved the request the loan would have been granted. McClennon prepared and made the presentation at the first tier which included his recommendation of $3,150,000. with a step up loan process to $3,500,000. Prior to making his presentation to the regional or mortgage loan committee (which was also referred to as the commercial loan committee at the trial) McClennon had met on November 14, 1989 with Hartman and had told him that his recommendation would be $3,150,000. with the step up process to $3,500,000. McClennon had no discussions with Witten between the time of their October 16th meeting and his presentation at the first tier on November 17, 1989. On November 17, 1989, the regional or mortgage loan committee voted to recommend to the senior loan committee a $3,000,000. construction mortgage loan to 714 Main Associates with Robert Hartman and Steven Witten as guarantors and in doing so that committee eliminated any provision for a step up process.
The matter then went to the senior loan committee. McClennon did not make the presentation to that committee nor was he present when it was made to that committee but one Ballentine, who was the senior commercial loan officer in that bank, made that presentation to the senior loan committee. The senior loan committee tabled 714 Main's request for the reason that there was not sufficient information contained in the financial documentation submitted with the proposal to determine where the source of the difference between what the plaintiff bank was willing to consider lending and the actual cost of the project, that is "where the funds were going to come from." Put in other CT Page 103 words the reason for tabling at the senior loan committee tier was that the plaintiff bank was concerned about "The difference between the cost of the project and what the bank was willing to consider lending, that sum we were looking for, documentation to support the financial wherewithal of the borrower and/or the guarantor [sic] to provide it" according to McClennon. The total project cost, as indicated above by the information package submitted to the plaintiff was $4,491,072 and the amount the bank was willing to consider lending was $3,000,000 and it was the difference between those two amounts which concerned the senior loan committee as just set out. The need for the additional documentation that the senior loan committee wanted was conveyed to Hartman and Witten. That information was probably conveyed to them within two weeks of November 17, 1989. As he testified, Hartman said that he knew by early December 1989 the action of the senior loan committee. The additional documentation was never furnished to the plaintiff bank by Hartman or Witten.
Some time later it was determined that the $1,600,000. million loan on the 714 Main site, which had been placed on May 23, 1989, was going to be treated as being in default. Keller met with Hartman at the letter's office on July 27, 1990 concerning that at which time Hartman said that because of the slump in the economy and the decline in general real estate that he was going to be unable to service that mortgage debt. At that time Keller told Hartman that the matter would be turned over to the plaintiff bank's workout department. Keller wrote Paul Ulrich, a senior vice president of the plaintiff in the bank's work out department indicating that he had met with Hartman to review the latter's financial condition and spoke of Hartman's desire to endeavor to pay his total debt. Keller asked Ulrich to meet with Hartman "to get a fix on his overall condition" looking toward a resolution. In that letter Keller identified Hartman's loans with the plaintiff as being: "Branford Office: Colony Beach Associates, $1.5 mm first mortgage and a $200 m second mortgage" and "Plantsville [Southington] office: 714 Main Associate, $1.6 mm first mortgage, plus second mortgage on guarantors' residences." Some communication by Hartman with some of the plaintiff's officers took place thereafter to no avail. The instant action to foreclosure the plaintiff's mortgage on the 714 Main site in Southington was instituted and returned to court on November 27, 1990.
As already noted the testimony presented serious questions of credibility for the court. Upon the defendants' motion to do CT Page 104 so, the court ordered the witnesses McClennon and Keller sequestered. These two witnesses were not in the courtroom when either Hartman or Witten testified. Hartman, as was his right, was in the courtroom throughout the presentation of all the evidence in this case. Witten appeared to testify, did so and left. It was apparent that of the two general partners of 714 Main Street Associates that Hartman was clearly the more dominant and aggressive. He was much more knowledgeable with the matters involved than was Witten.
We have already set out at some length certain facts, to which we will add more as necessary. They do, however, serve as a background for turning to the issues and claims made so as to invoke the applicable law.
We turn to the alleged oral commitment made by the plaintiff to furnish a one million dollar credit line, which insofar as the defendants are concerned, depends wholly upon the testimony of Hartman. Witten's testimony did not touch this issue. Hartman maintained that his discussions with Keller before the acquisition and mortgage closing on 714 Main Street he discussed the providing of such a credit line and that Keller's statements and conduct constituted an oral commitment by the plaintiff to make available to the defendants a one million dollar credit line for the defendants. Keller's position was that neither before the closing of the $1,600,000. mortgage on May 23, 1989 or after that did he ever discuss with Hartman the granting of a one million dollar credit line being provided to 714 Main Associates. The credible evidence causes us to conclude that there was no such oral commitment ever made.
Hartman was in touch in January 1989, with Keller, whom he knew, with reference to "the contract being negotiated" with Water Wood to purchase the 714 Main property. In his letter to Keller of January 13, 1989 Hartman stated that 714 Main Street Associates would be looking for $2.5 million to cover soft costs and construction costs for which a first mortgage on the site would be given to the plaintiff. Nowhere in that letter does he refer to a million dollar credit line although he testified that he had discussed it with Keller in January 1989. On February 14, 1989, Hartman wrote Keller to outline "the salient points affecting our planned acquisition, rehabilitation and expansion . . ." of 714 Main Street, attaching a pro forma setting out acquisition costs, anticipated expenditures and a summary of income and expenses. The cover letter is fairly comprehensive CT Page 105 but neither it nor the attached pro forma refer to any line of credit from the plaintiff. On April 6, 1989, the plaintiff issued its commitment letter to 714 Main Street Associates agreeing to lend it $1,600,000 to be secured by a first mortgage on the 714 Main site upon the terms and conditions in that letter. When Hartman returned his and Witten's signed acceptance of that commitment on April 10, 1989 he noted in it that the only problem he had with it was the condition of zoning approval concerning the site which he crossed out. During the entire course of this matter Hartman wrote a number of letters to the plaintiff about this project. The April 10, 1989 letter is one and it does not refer to any credit line. The plaintiff Bank through Keller agreed to lend the money to acquire the site as well as enough additional moneys to carry the project until the time when construction financing was obtained by 714 Main. It did that by the May 23, 1989 mortgage. Even Hartman agreed that this was the reason that the mortgage amount exceeded the acquisition cost. Hartman admits that when the mortgage was closed on May 23, 1989 he did not expect that the plaintiff would be doing the construction financing but that he did expect to be given a one million dollar credit line as the result of his dealings with Keller up to that time. There is no credible evidence to that end. It is relevant to point out that while there is the 714 Main Street Associates partnership resolution of May 22, 1989, signed by Hartman and Witten as all of the general partners of 714 Main Associates which approved the borrowing of $1,600,000 pursuant to the April 6, 1989 commitment letter, there is no partnership resolution concerning any one million dollar credit line or any additional loan in that amount despite Hartman's testimony that that was to occur.
It is important also to note that, despite the claim that there was an oral commitment by the plaintiff to extend the defendants this alleged one million dollar credit line, there is nothing in writing signed by the plaintiff that it was willing, let alone agree, to lend more than the $1,600,000. it did on May 23, 1989. it is more important, however, that there is nothing at all in the letters in evidence from 714 Main Street associates, Hartman and Witten or in any writing that even refers to the alleged one million dollar credit line. There was never any such oral commitment of this nature ever made by Keller but also never by any other representative of the plaintiff. The evidence on this fact issues simply is not credible. The defendants have not sustained there burden of proof here. CT Page 106
The defendants also claim that it had been established factually that as of the closing of the loan on May 23, 1989 Hartman expected to receive the $200,000. held back when 714 Main obtaining the final approvals from the town of Southington, a credit line of one million dollars when the approvals were received and a release of the mortgages on his and Witten's home as well as the $1,400,000. for the purchase of the 714 Main site. Other than the $1,400,000 for the purchase (actually the mortgage was for $1,600,000), according to Hartman that these other "expectations" were all oral agreements.
We have already discussed the one million dollar credit line claim which we do not accept. The $200,000. hold-back was in fact made available to the defendants once the Town approvals were conveyed to the plaintiff. An interesting items should be pointed out concerning this $200,000. hold back. By his letter of September 15, 1989, Hartman, more than two months after 714 Main's receipt of approval of their site plan by the Planning and Zoning Commission of Southington, Hartman forwarded them to DelBasso and Zoning Commission of Southington, Hartman forwarded them to DelBasso at the plaintiff's bank. There is no credible reason why he waited for this period of time to do so.
Insofar as Hartman's "expectation" that as of the loan closing of May 23, 1989, he expected to receive a release of the mortgages on his and Witten's home, there is no credible evidence to support such a claim. Parenthetically, an examination of the court file in Docket #313135 which is the foreclosure action brought by Union Trust against Robert Hartman and Carol Hartman it as to foreclosure upon the Hartman's Trumbull residence the pleadings do not disclose any such claim.
In this case the defendants have raised as a defense to the requested foreclosure the doctrine of promissory estoppel. Estoppel is pleaded in their second special defense.
We set out initially several applicable principles of law. Our Supreme Court has said that "`Under our well-established law, any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury. Bozzi v. Bozzi, 177 Conn. 232,242, 413 A.2d 834 (1979); Dupuis v. Submarine Base Credit CT Page 107 Union, Inc., [170 Conn. 344, 353, 365 A.2d 1093 (1976)]; Pet Car Products, Inc. v. Barnett, 150 Conn. 42, 53-54, 184 A.2d 797
(1962).' Zoning Commission v. Lescynski, [188 Conn. 724, 731,453 A.2d 1144 (1982)]." Kimberly-Clark Corporation v. Dubno,204 Conn. 137, 148, 527 A.2d 679 (1987)." O'Sullivan v. Bergenty,214 Conn. 641, 648 (1990). In D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, 202 Conn. 202, 213 (1987) that court said: "Under the law of contract, a promise is generally not enforceable unless it is supported by consideration. E. Farnsworth, Contracts (1982) 2.9, p. 89; A. Corbin, Contracts (1963) 193, p. 188. This court has recognized, however, the development of liability in contract for action induced by reliance upon a promise, despite the absence of common-law consideration normally required to bind a promisor; see Restatement (Second), Contracts 90 (1973). Sheets v. Teddy's Frosted Foods, Inc., supra, 475; Hebrew University Assn. v. Nye, 148 Conn. 223, 232, 169 A.2d 641 (1961); see A. Corbin supra, 194, p. 193. Section 90 of the Restatement Second of Contracts states that under the doctrine of promissory estoppel `[a] promise which the promissor should reasonably expect to induce action or forbearance on the part of the promisor a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise.' A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promisor could reasonably have expected to induce reliance. Thus, a promisor is not liable to a promisee who has relied on a promise if, judged by an objective standard, he had no reason to expect any reliance at all. E. Farnsworth, supra, 2.19, p. 95." D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, supra 213.
Where there is the necessary detrimental reliance as demonstrated by the promisee's action or forbearance, then the detrimental reliance satisfies the necessity of consideration required for a valid contract. See Bender v. Design Store Corp.,404 A.2d 104 (D.C.App. 1979). We note that where the Statute of Frauds is claimed, the doctrine of estoppel may be applied to prevent the use of that doctrine to prevent a fraud. DeLuca v. C.W. Blakeslee Sons, Inc., 174 Conn. 535, 544 (1978) D'Ulisse-Cupo requires that it is a fundamental element of promissory estoppel that there exist "a clear and definite promise which a promisor could reasonably have expected to induce reliance." D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, supra. Corbin says that a promise comes about when CT Page 108 "one expresses an intention that some future performance will be rendered and gives assurances of its rendition to the promisee." 3A A. Corbin on Contracts 633 at p. 25. The Restatement of Contracts is in accord and says: "A promise is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made." Restatement (Second) of Contracts 2(1) at p. 8, 1981). It should be recognized that "intention" and "promise" are not the same. "An intention is but the purpose a man forms in his own mind. A promise is an express undertaking or agreement to carry the purpose into effect." Holt v. Akarman,84 N.J.L. 371, 86 A. 408, 409. A question of intent is a question of fact." Intention is a mental process, and of necessity it must be proved by the statement or act of the person whose act is being scrutinized . . . . A person's intent in any regard is to be inferred from his conduct . . . and ordinarily can be proven only by circumstantial evidence." DeLuca v. C.W. Blakeslee sons, Inc., supra 546-547.
The defendants, claim that the plaintiff promised to loan 714 Main the permanent construction financing for the project. This is so their brief sets out because the plaintiff bank "enticed" the defendants into believing that it would fund the project "during an interim period or fully and so they stopped seeking financing elsewhere." As a result of the plaintiff's claimed denial of the funding, "particularly with regard to the reneging of the Bank on the one million dollar credit line", it is claimed that the defendants were injured and damaged in that they were not able to complete the project, thus losing their investment and the opportunity to achieve the projected profits and this, they claim satisfied the requirements of the claimed estoppel. Based on the law and the credible evidence the court does not agree.
In making the claim that the plaintiff bank promised to furnish permanent construction financing we note that, as between Hartman and Witten, the defendants claim to have proven as a fact that Hartman was "principally responsible for carrying on all negotiations regarded the purchase of the property and the financing of the purchase." (underlining added). This claimed finding is not quite correct as Witten had nothing to do with the financing insofar as any contact with the plaintiff looking toward obtaining financing from the plaintiff which ultimately led to the closing of the $1,600,000 mortgage loan out of which the 714 Main site was purchased on May 23, 1989. In fact, Witten CT Page 109 had no discussions with any representative of the plaintiff bank about any loan concerning the 714 Main site prior to the May 23, 1989 mortgage closing. There is no evidence that Witten ever spoke to Peter Keller.
The defendant's brief also claims that the plaintiff agreed to fund the project, during an interim period and that the plaintiff wanted to do [the financing he claims] in "stages"[9] and their failure to do caused them the damages claimed. We have already found what the plaintiff through Keller agreed to do that resulted in the May 23, 1989 mortgage. There was no promise by the plaintiff to do any more than was done then, i.e. to lend the $1,600,000 to acquire the property with some excess dollars to carry the project until permanent construction financing was obtained. Hartman himself so testified at one point during the trial. Hartman did not even know in January and February 1989 what the actual construction costs of the project were. The pro forma for the 714 Main project Hartman submitted to the plaintiff on February 13, 1989 was admittedly not complete. A more complete pro forma was submitted much later to DelBasso in October 1989. Throughout Hartman knew Keller had no authority to lend as to permanent construction financing. He even said that his deal with Keller was to obtain money for the acquisition as well as enough money to carry to project until he (Hartman) obtained permanent construction financing from Fleet Bank with whom he had discussions about that. Hartman himself admitted that when he was talking to Keller "we never had any intention whatever to deal with Union Trust as a credit loan . . . . it was not joining [sic] to be into a construction, and it was not going to be in a permanent loan at the beginning. It was purely for acquisition and enough money to cover the project while we were going, until we got the construction loan and approved and funded through Fleet Bank." Actually up to "moment" of the closing of May 23, 1989, Hartman was in negotiations with other banks, i.e. Fleet Bank and CBT for money and he continued to be for some time after May 23, 1989. He claims that he was so negotiating with the other banks to get money above and beyond what he expected to get from Union Trust which was, according to him, the $1,600,000 mortgage loan plus a one million dollar credit line. We have already rejected his claim of the one million dollar credit line and will not repeat the circumstances there. Witten, who had difficulty recalling a number of things, said that it was around the time of the closing that he became involved in efforts to secure construction financing for the 714 Main project. CT Page 110
Turning to the post mortgage closing "stage" the defendants maintained that both Hartman and Witten were talking to various lending instruction concerning construction financing. Witten said that he was specifically involved in discussions with CBT, he "believed" that he "may have discussed" it with First Constitution Bank and he believed that he spoke with "someone" at New Haven Savings Bank. Hartman said that he was discussing it with CBT and Fleet. According to Hartman who indicated efforts to obtain financing from lenders continued into the fall 1989: "We had a verbal approval from CBT and we had a verbal approval through Fleet, that they had a very strong interest in doing the financing at Riverview Plaza [that is the 714 Main project]. We presented two projects to CBT, one was this and other one was up in Hartford, a larger center." This is the nature and quality of the firmness and progress of 714 Main's negotiation with other lenders which they "gave up" once the defendants "started getting a firmer handle with David McClennon and based on the conversations I [Hartman] had with Art (sic) DeBasso or Cabasso." This is interesting keeping in mind that McClennon first met with Witten and DelBasso on October 16, 1989. There is no evidence to prove that McClennon even met or spoke to Hartman until after October 16, 1989. Hartman was negotiating, he said, with CBT, because insofar as the plaintiff was concerned, "we [the defendants] didn't have any construction contract or to do financing, so I [Hartman] never anticipated them [the plaintiff] to do that financing." All this was oral and there is not a single written piece of evidence to support the testimony here of Hartman or Witten. There is also, of course, nothing to corroborate these claims.
Other than the statements of Hartman and Witten on this aspect there was absolutely no documentation by way of such things as letters, notes or any live testimony of a representative of any of those lending institutions to bear out this unsupported testimony from these two witnesses. Not even the name of anyone at any one of these institutions allegedly consulted was given as to anyone contacted before DelBasso indicated that the plaintiff might be interested in furnishing permanent construction financing.
In any event, while Witten could not remember when it was that he had his first contact with any representative of the plaintiff he did recall that it was with DelBasso. Witten thereafter spoke to DelBasso more than once letting DelBasso know what was doing with the 714 Main project across the start from CT Page 111 the plaintiff's Southington, what the plan of that project was and endeavoring to keep DelBasso abreast of "our activity" at the project. Thereafter DelBasso indicated that the plaintiff might: be interested in doing the permanent construction financing for the 715 Main project. Witten passed this information along to Hartman who was surprised to learn this as he (Hartman) had never expected that the plaintiff Bank might be so interested. This occurred not long after September 15, 1989 where the "scope" of the project had changed allegedly due to certain requirements imposed by the town of Southington. Actually Hartman did not even know the actual construction costs of the project as of that September 15, 1989. In any event Hartman forwarded "a package of information" on the project to Witten to give to DelBasso. This included a much more comprehensive proforma of the project than he had given to Keller in February 1989.
It is significant to note here that Hartman testified that he never actually saw DelBasso himself. Witten, however did. It is apparent that what came out of the October 16, 1989 meeting between Witten, DelBasso and McClennon was that the latter indicated to Witten that, assuming the furnishing to him of certain items missing from the package of information earlier received from DelBasso, that he (McClennon) would be willing to recommend that the plaintiff bank lend $3,160,000. to 714 Main Street Associates plus a possible step-up if it could be. demonstrated to the bank that the project could produce that: income to justify that step-up.
There is no credible evidence that Witten and McClennon ever again met face-to-face about the potential permanent construction mortgage financing of the 715 Main project. Again Witten's recollection of specifics, particularly times and content of certain conversations, was on occasion quite spotty and sometimes non-existent.
Insofar as Witten was concerned his claim as to why discussions with other lending institutions to obtain permanent construction financing ceased when discussions with McClennon to that end came about in not very credible. These include his claim that it was the "level of enthusiasm (of McClennon) about the viability of the project and Union Trust's involvement," its "anticipated success", the proximity of Union Trust's branch across the street from the project. While he could not recall specific discussions with McClennon in a number of instances about the specifics of the loan sought or that might be CT Page 112 recommended, his "asumption" was that "it was a rubber stamp deal . . . if McClennon liked the deal, that the deal would be done." However, he could not recall if McClennon ever told [him] that if he [McClennon] liked the deal it would be done." Witten's testimony suggesting that his "assumption" was that "McClennon . . . was somewhat of the top gun in Hartford that had the ability to pretty much review the documents, make a decision based on their typical underwriting and pretty much had the ability to approve this loan "we find had no basis in fact. More to the point, when was pressed on cross-examination as to whether he believed "it was McClennon's authority to be able to approve the loan, or merely to have recommend that the loan be approved," by a loan committee, Witten finally said that "I can't believe that the final approval of a loan of that size would not have been subject to approval." There is no question that Witten knew this. Hartman knew from the start of his dealings with the plaintiff concerning 714 Main Street that Keller had nothing to do with construction mortgage lending. Hartman also knew that as to the May 23, 1989 closing Keller had turned the 714 Main matter over to DelBasso. Hartman never met McClennon until November 14, 1989 concerning the construction loan application. Hartman's testimony as to the level and time of his discussions with CBT and Fleet, here as in other instances, is hardly persuasive. According to him these discussions ceased when "we started to get a firmer handle with Dave McClennon and based on [Hartman's] conversations with DelBasso"[10] and that McClennon indicated that the plaintiff was "very interested" in it. It was about the time that Hartman met with McClennon in November 1989 that he maintains he went to CBT and Fleet Bank and told them that he would not be dealing with them. When McClennon told him that he would recommend a loan of 3.2 million to be stepped up to $3.6 million, Hartman "assumed" that because McClennon would recommend it that it would be approved because "there wouldn't be any reason not to believe it because it had happened in the past" and if McClennon recommended it would be "a done deal". What had happened "in the past" is not borne out by any of the evidence especially keeping in mind that he had never met McClennon until November 14, 1989. Morever, defendant's claim that the president of the plaintiff "wanted" this loan to go through; there is no credible evidence to support that either. More, however, to the point, Hartman ultimately admitted on cross-examination that he knew that the approval for the loan had to go "further up" than McClennon. He knew, as of November 14, 1989, that the loan application would have to be approved but he assumed that when the president of a bank wants the project then Hartman "would CT Page 113 assume that it would get done."
Thereafter, during the loan application process the plaintiff's senior loan committee tabled 714 Main's application as it was concerned about where the money for the project was coming from to make up for the difference in the amount of actual construction cost of the project as indicated by 714 Main's figures and the amount of money that the plaintiff was willing to consider lending. This difference amounted to about $1,400,000. This concern was transmitted to Hartman but that information was never given to the plaintiff Bank by defendants Hartman, Witten or 714 Main. There is no question that Hartman knew by December 7, 1989 that the loan application had been turned down. The turning down of the defendants' application was also conveyed to Witten.
Based upon the facts found by the court above in this memorandum it is concludes that the defendants, either singly or collectively have not proven that the doctrine of promissory estoppel has been proven in this case. As the Supreme Court said in D'Ulisse-Cupo; "A fundamental element of promissory estoppel, therefore, is the existence of a clear and definite promise which a promissor could reasonably have expected to induce reliance "D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, supra. 213. Such a promise is a "sine qua non" for the application of this doctrine. The Malaker Corporation Protective Committee v. First Jersey National Bank, 163 N.J. Super. 463,395 A.2d 222 (1978), cert. denied 79 N.J. 88, 401 A.2d 243 (1979), United States Jaycees v. Bloomfield, 434 A.2d 1379, 1384
(D.C.App. 1981). See B.M.L. Corporation v. Greater Providence Deposit, 495 A.2d 675 (R.I. 1985). The circumstances of this case are quite similar to D'Ulisse-Cupo and, in our view, present an ever stronger case for finding that the elements promissory estoppel have not been proven. The conduct of the plaintiff's representatives were really at best no more than indications that the plaintiff intended to enter into an agreement with the defendants sometime in the future to lend them money. Such conduct and/or representations, contrary to the defendants' claims, did not manifest any present intention "to undertake immediate contractual obligations" to the defendants. Id. 214-215. The defendants certainly knew this. It must be remembered that Hartman himself said he was "an experienced developer. The actions, discussions, assumptions and the like claimed by the defendants to have been proven do not arise at all to a clear and definite promise by the plaintiff to make the CT Page 114 alleged construction loan. Some suggestion is made that McClennon and/or DelBasso had the authority to do so, but that has not been proven. This is so because the fact issue of apparent authority, if that is the claim, must be derived not from the acts of the agent but from the acts of his principal and that has not been proven. Lettieri v. American Savings Bank,182 Conn. 1, 8 (1980). For apparent authority to be established "the acts of the principal must be such that (1) the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted him to act as having such authority, and (2) in consequence thereof the person dealing with the agent, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority." Nowak v. Capitol Motor, Inc., 158 Conn. 65, 69 (1969); Lettieri v. American Savings Bank, supra. Particularly telling against the defendants' claim that a clear and definite promise to lend then the construction mortgage money has been established is the circumstance that both Hartman and Witten knew that the approval for that had to go to a committee at the plaintiff bank, that it had to go "further up" than those representatives of the plaintiff with whom they were negotiating. The defendants having raised the matter of promissory estoppel had the burden to establish all of its elements including that of "a clear and definite promise." See Middlesex Mutual Assurance Co. v. Wash.,218 Conn. 681, 699 (1991). D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, supra. 212n. 12, see also Rahmati v. Mehri, 188 Conn. 583, 587 (1928).
We are aware that where the required type of promise is proven it encompasses the necessity of proving that it was one that the promisor could reasonably have expected to induce reliance upon it by the promisee. Accordingly, a promisor is not liable to a promisee, under such cases as D'Ulisse-Cupo, to a promisee who has relied on a promise which if, judged by an objective standard, the promisor had no reason to expect any reliance at all. D'Ulisse-Cupo v. Board of Directors of Notre Dame High School, supra, 213. The failure of the defendants to prove the clear and definite promise required by our case low is itself dispositive of their claim of promissory estoppel.
Even were promissory estoppel applicable and keeping in mind that any claimed detrimental reliance must be reasonable, see e.g. Garner v. United States Office of Personnel Management,633 F. Sup. 995, 1000 (E.D. PAT 1986), affirmed 808 F.2d 1516 (1986); Wharf Restaurant, Inc. v. Port of Seattle, 24 Wash. App. 601, CT Page 115605 P.2d 334, (1979), the defendant's claimed "detrimental reliance" here was not reasonable. This is borne out by what we have said earlier including the fact that both Hartman and Witten knew, in the first instance, that the loan applied as required to be approved by a committee of the plaintiff bank. This alleged reliance aspect, when viewed from the perspective of the plaintiff bank was such that it could not reasonably be held to expect the reliance claimed. As stated earlier the defendants have not sustained their burden of proof of establishing the elements essential to the application of promissory estoppel. Middlesex Mutual Assurance Co. v. Wash., supra., 699.
In addition, it is claimed that the plaintiff, through Peter Keller, made an oral commitment to loan moneys to 714 Main after 714 Main's application for construction financing had not been approved. This claim is made despite the claim of Hartman and Witten that it had been expected the defendants would be given a one million dollar credit line to carry the project through to construction financing. 714 Main's claims of proof in its brief assert that as proven that "Hartman discussed the need for this funding with Keller again in 1990." It is true that Hartman and Keller spoke in 1990 when it appeared that 714 Main was going to be unable to continue to service the debt represented by the plaintiff's mortgage of May 23, 1989. At that time Keller told Hartman the matters[11] would be turned over to the plaintiff's workout department as it was to Paul Ulrich. There is no credible evidence that Keller, or anyone on behalf of the plaintiff did before that occasion, on that occasion or thereafter made any representation about making available any such credit line or for that matter any kind of loan from the plaintiff. Again, as before, there is no evidence as to this claimed credit line. Again there is nothing in any writing to give any support to this claim. The defendants have not sustained their burden of proof of demonstrating any enforceable obligation against the plaintiff in this case on the alleged credit line claim.
In another special defense it is claimed that the plaintiff is barred from proceeding with this action because the plaintiff's action as alleged were in breach of the implied covenant of good faith. The defendants' briefing claims that that breach in this case arises from the plaintiff bank's failure to deal with the second stage of the financing in a reasonable and timely manner. In making this claim they, however, go on and argue that the representations 714 Main has CT Page 116 already contended were made under the special defense of estoppel were such that they left 714 Main "with the clear expectation that the Bank would fund and that the treatment of the application would not be handled as an arm's length transaction." However, it is contended here that "when the Bank turned around and took a "hard-nosed" stance, 714 Main was effectively cut-off from other financing and the Project failed, leading to this suit." Therefore, because, under the circumstances, as the defendants claim them to be, the plaintiff "owed it to 714 Main to fund and its changed stance, taken without warning was not a `good faith' change."
The implied covenant of good faith and fair dealing has been applied by our Supreme Court in variety of contractual relationships. See e.g. Magnan v. Anaconda Industries, Inc.,193 Conn. 558, 566 (1984) and cases there cited." The Restatement (Second) of Contracts similarly recognizes an implied contract of good faith and fair dealing in every contract without limitation. See 2 Restatement (Second) Contracts, 205 (1979); Connecticut National Bank v. Douglas, 1 Conn. L. Rptr. 580 (1990) also General Statutes 42a-1-203. `Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . .' Restatement of (Second) Contracts, 205, comment a (1979) . . ." Id. 566-567" Good faith . . . in common usage . . . has a well-defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and generally speaking, means faithful to one's duty or obligation. 35 C.J.S. 88. It has been well-defined as meaning "An honest intention to abstain from taking an unconscientious advantage of another, even through forms of technicalities of living together with an absence of all information or belief of facts which would render the transaction unconscientious. 2 Bouvier Law Dictionary (3d Ed) p. 1359." Synder v. Reshenle, 131 Conn. 252,257 (1944). The determination of good faith involves an inquiry into the party's motive and purpose as well as actual intent. Id. 259" Phillipe v. Thomas, 3 Conn. App. 471, 474-425 (1985). Of course, good faith cannot stand alone as it is an obligation that must attach to some conduct. State Bank of Hartland v. Arndt, 385 N.W.2d 219, 223 (Wis.App. 1986). The application of the covenant of good faith and fair dealing occurs when there is already a contract, i.e. an enforceable obligation because "The implied covenant is derivative, that is, it does not create or supply new contract terms but grows out of existing ones." Pizza CT Page 117 Management Inc. v. Pizza Hut, Inc., 737 F. Sup. 1154, 1179 (D.Kan. 1990).
"Good faith" is "essentially . . . a rule of construction designed to fulfill the reasonable expectations of the contracting parties as they presumably intended . . . ." Magna v. Anaconda Industries, Inc. supra 567. The implying of a covenant of good faith and fair dealing in every contract is for the purposes of evaluating a party's performance of that contract. Hoffmaster v. Guiffrida, 630 F. Sup. 1289, 1290-1291 (S.O. W. VA. 1986); see Restatement (Second) Contracts, 205 (1981). We have already concluded that no enforceable contract by the plaintiff to lend 714 Main any money as claimed has been proven in this case. Accordingly, because there is no enforceable contract between the parties to be the subject of a "good faith" construction that circumstance alone is dispositive of the special defense alleging a violation of the good faith obligation.
While the foregoing is dispositive of the "good faith" special defense something further concerning it should be noted. The court has, at some length, quoted from 714 Main's brief; concerning particularly in view of the broad claim on it which expands on its first statement that the "breach of covenant of good faith in this case arises from the plaintiff bank's failure to deal with the second state of the financing in a reasonable and timely manner." This claim cannot be accepted. Under the credible evidence already set out, 714 Main's construction financing application was dealt with in a timely and reasonable manner. As we have seen it went through plaintiff's required bank procedure and 714 Main actually knew of the denial of their request by Hartman's own testimony by December 7, 1989.
714 Main's broadening of this claim, as set out, requires brief discussion. That concerns its claim that the representations of the plaintiff bank were such that the treatment of 714 Main's application "would not be handled as an arm's length transaction" (underlining added) and that with the bank's thereafter taking a "hard-nosed stance" meant that 714 Main was "effectively cut-off from other financing" with the resulting failure of the 714 Main project and the institution of this litigation.
This claim has not been proven and while we need not repeat all the evidence already set out we do note several matters. CT Page 118 Black speaks of an "arm's length transaction" as being "a transaction negotiated by unrelated parties, each acting in his or her own self interest . . . . A transaction in good faith in the ordinary course of business by parties with independent interests . . . ." Black's Law Dictionary (6th ed. 1990). 714 Main has not proven that the plaintiff bank represented that its treatment of its application to obtain construction funding from the plaintiff was not to be at arms-length. As to the alleged turn about and the assumption by the plaintiff of a "hard-nosed stance" that has not been proven. Hartman was admittedly "an experienced developer", he knew the process and he and Witten both knew committee approval or "further up" (in the bank) approval for their construction financing was needed as we have already discussed in sorting out the credible evidence including the "other financing" from which 714 Main was "effectively cut off". Insofar as any claim for credit line may play into this aspect we have already said that it has not been proven that there ever was any representation, let alone agreement, by the plaintiff to make such available.
Going on we turn to the two special defenses invoking the Connecticut Unfair Trade Practices Act (CUTPA) in General Statutes 42-110a et seq. It is not necessary to reach and/or decide either of these special defenses, even assuming CUTPA applies to banks, a matter we do not decide. For the record, he fourth and fifth special defenses are overruled.
The fourth special, however, which invokes makes the allegation that CUTPA violations occurred because the alleged "actions of the plaintiff were done with the knowledge that the defendants would be unable to secure other financing to complete the project and with reckless disregard for having undermined the defendants' ability to obtain financing." Even if CUTPA applied to banks, the fourth special could not have been found proven by the defendants.
In like manner the fifth special defense is overruled. In doing so, one additional comment is made. Again after alleging certain conduct of the plaintiff, the defendants here make the allegation that "the plaintiffs [sic] are pursuing this action as they have arrangements to transfer the property to third parties." It is pointed out that there was no evidence adduced at the trial at all on this allegation.
For the record, the defendants have not sustained the burden CT Page 119 of proof on any of their special defenses and they are, thus, all overruled.
We turn now to the defendants' counterclaim. In their pre-trial brief they argue that their counterclaim raises two theories of recovery: (1) breach of the covenant of good faith and (2) CUTPA violations. They also argue that the facts that give rise to the breach of covenant of good faith claim are the same as discussed under their third special defense and that the CUTPA claims alleged in the counterclaim include the issues raised in the fourth and fifth special defenses as well as including the breach of covenant of good faith claim. In their trial brief, in which they have set out the facts that they claim to have established at the trial, they contend that the same facts that support the CUTPA special defenses support the defendants' counterclaim.
We have earlier set out the facts established by the evidence and these include those necessary to dispose of the counterclaim which is essentially a reiteration of issues raised by way of special defense. The defendants have not sustained their burden of proof on the counterclaim. Accordingly judgment on the counterclaim is entered in favor of the plaintiff Union Trust.
The plaintiff Union Trust is, accordingly, entitled to a judgment of strict foreclosure of its mortgage of May 23, 1989 and a decree of strict foreclosure is entered. The Court determines that the value of the mortgaged property known as 714 Main Street is $860,000.00.
It is determined that the debt due the plaintiff is as follows:
 Principal $1,600,000.00 Interest thereon to the date of this judgment at $422.23 per diem 464,289.38 ------------- $2,060,479.75[12]
The amount to be allowed plaintiff's counsel for attorneys fees requires some discussion. The amount of $24,515.35 is sought in payment of its attorneys' fees and costs. Time sheets CT Page 120 have been submitted by plaintiff's counsel. Defendants' Counsel argues that these figures in part represent plaintiffs' attorneys and costs attributable to two other foreclosure cases. One case is Union Trust Company v. 714 Main Associates, et als., i.e. Docket #90-030761 in which Steven Witten and Deborah Witten are among the named defendants and Docket #90-313135 in which Robert Hartman and Carol Hartman are among the named defendants and is referred to above as the Trumbull foreclosure and/or Hartman Foreclosure.[13] The foreclosure, referred to above as the Woodbridge foreclosure, was instituted by Union Trust at the same time as the instant action, because of a mortgage given by the Wittens on May 23, 1989 on their Woodbridge real estate in security for the guaranty agreement Steven Witten executed on that date to secure the payment of the $1,600,000.00 note of the same date on the 714 Main Street property. The plaintiff's mortgage on the Wittens Woodbridge property was junior to a prior mortgage to another Bank. That latter bank foreclosed its mortgage and the plaintiff's mortgage on the Witten's Woodbridge property was foreclosed out at that time. Plaintiff's counsel in the instant case did render legal services in the Woodbridge foreclosure case which case. All three cases, i.e. the instant action, the Hartman (Trumbull) action and the Witten (Woodbridge) action were all consolidated for trial. The Witten case, however, has since been withdrawn.
The other foreclosure, i.e. the Trumbull foreclosure in which the Hartmans are among the defendants was instituted at the same time as the instant action. That mortgage also came about by virtue of a mortgage given by the Hartmans on May 23, 1989 in security for the guaranty agreement Robert Hartman executed on that date to secure the payment of the $1,600,000.00 note of the same date on the 714 Main Street property. The plaintiff's mortgage on the Hartmans' Trumbull property is junior to a mortgage in the original amount of $130,000.00 now held by a federal mortgage institution. Plaintiff's counsel in the instant case has rendered legal services in the Trumbull foreclosure case. As already pointed out the Hartmans' Trubmull property in subject to the stipulation entered into by the parties at the outset of the trial.
In any event, the court has examined the time sheets of plaintiff's counsel and the court file. The instant action as well as the other two actions were all instituted in the effort to foreclose a single debt, i.e. the plaintiff's mortgage of May 23, 1989. Under the circumstances, the court has determined that CT Page 121 a reasonable attorney's fee for plaintiff's counsel in this case is $18,350.00 which amount is to be added to the debt.
The Court further finds that $3,750.00 is a reasonable fee for appraisal services including court testimony of the plaintiff's expert and that $150.00 is a reasonable fee for the title search, both of which are allowed as part of the plaintiff's costs.
A decree of strict foreclosure having been entered the Court sets the following law days:
 February 23, 1993 714 Main Associates February 24, 1993 Robert D. Hartman and Steven B. Witten February 25, 1993 Steers Smith and Associates February 26, 1993 Empire Paving Inc. March 1, 1993 A. Tamburini Sons March 2, 1993 F F Concrete Corporation March 3, 1993 Walter S. Wood
As stated, the instant case was consolidated with the Hartman foreclosure case, i.e. #90-0313135 which involved the foreclosure of a mortgage given the plaintiff on the property of Robert Hartman and Carol Hartman in Trumbull. Pursuant to the stipulation of the parties at the outset of trial all the evidence heard with reference to the 714 Main foreclosure "is equally applicable to the Hartman [Trumbull] foreclosure." That stipulation further provided in paragraph 4 that "If judgment is rendered in favor of Union Trust in the 714 Main Foreclosure, then similarly, judgment should enter in favor of Union Trust in the Hartman Foreclosure. In such case, judgment in the Hartman Foreclosure should not enter until the Court determines the amount of a deficiency, if any, in the 714 Main Foreclosure. At such point, judgment may enter in favor of Union Trust in the Hartman Foreclosure in such amount as the Court may determine with respect to the deficiency judgment . . . ." It is for reason of this stipulation of the parties that judgment is not at being entered in the Hartman foreclosure, i.e. #90-0313135 having in mind that the stipulation of the parties extends the time to do so because of their stipulation concerning any issue of a deficiency judgment.
Judgment of strict foreclosure in the instant case, i.e. #90-0312088 is entered in accordance with the foregoing. CT Page 122
Arthur H. Healey, State Trial Referee